Martin Evans, J.
This is a motion on behalf of the New York Times Company, Michael Boy Ion, an assistant editor in the news picture department, and Tyrone Dukes, a photographer employed by the New York Times, for an order vacating certain subpoenas issued by an Assistant District Attorney of the County of New York and served on the movants.
The subpoena served on the New York Times Company and Michael Boylon denominated therein as assistant head news picture department of the New York Times directs that they appear as a witness and produce certain photographs, negatives and contact sheets showing a certain bannister which was referred to in a news article published by the New York Times Company on April 18, 1972 and certain books, records and documents showing records of the name of the photographer, the date of the photographs, the date of the developing and printing of the photographs, and records showing the custody of the photographs, contact sheets and negatives from the time they were taken up to the present time.
Three affidavits in support of the motions have been made: one by the photographer, Tyrone Dukes, who states only that he is reflected in the record of the New York Times as having taken certain photographs on April 17, 1972, one of which appeared in the New York Times on April 18, 1972, and that he has no present recollection of having taken it or visiting the place in which it is stated to have been taken; one by Mr. *793 A. M. Rosenthal, Managing Editor of the New York Times, who sets forth no facts beyond his status, but does set forth his professional reasons for the motion.
The third affidavit is by counsel for the moving parties.
No affidavit has been submitted by one Eric Pace who appears to be the reporter who reported the statements made to him by Yusef Shah and muslims relating to marks on the bannister. Presumably, the photographs were of this bannister.
It is appropriate to restate at this time what is sought by the subpoenaed witnesses and records. The People apparently desire to prove, as a part of their affirmative case, the existence of a bullet hole or bullet marks on the bannister in the hallway of 102 West 116th Street, on or about April 17, 1972.
It is claimed by the People, and not denied by the movants, that Tyrone Dukes was there and took photographs of the bannister. Of course, by the proof that it was there on April 17, 1972, the People seek to prove that it was there on April 14, as a result of the shooting.
The photographs, if they exist, and the testimony, are clearly relevant to the case now on trial. The defendant is charged with the murder of a police officer by shooting. The incident took place on April 14, 1972, and the evidence at this time shows that a total of nine bullets were fired during a period of a few minutes.
It is charged that one of these nine was fired by the defendant into the police officer at point blank range. The other eight, so far as it appears were fired by the police officers and aimed at different places in the hallway where the incident occurred.
Therefore, the trajectory of each of these bullets, as shown by the place from which it was fired and the place where it struck a wall or bannister, is of importance to the affirmative case of the People.
It has not been shown that the People have available any other witnesses to the facts they expect to establish through the three subpoenas they have served, except, perhaps, one Yusef Shah and other unnamed muslims who are mentioned in the published article on April 18, 1972, and who by reason of their relationship to the defendant and to the defendant’s counsel would probably be hostile to the People.
Although the availability of other witnesses can never *794 deprive any party of the right to call witnesses chosen by that party, the court has an inherent right under its duty to expedite trials, to vacate a subpoena on the ground of over accumulation of unnecessary witnesses. In this case, however, to do so would not be proper.
The other factual arguments raised by counsel for the moving parties, that is, on information and belief as set forth in items numbered A, D, E, F, G and I on pages 5 and 6 of his affidavit to the effect that the photographer whose testimony is sought cannot now recall what he did, that the persons who now have custody of the photographs have no personal knowledge of the crime, that no contemporaneous prints were made of the negatives four years ago and other like matters are not relevant to this motion.
These arguments might be made by the defendant if and when the testimony sought is in fact offered.
Item H, that the photographs sought could have been taken by the police subsequent to the event, is also entirely irrelevant since neither estoppel nor laches have been established in this case.
The proper administration of justice is one of the bulwarks of our constitutional democracy; and the right of citizens to obtain evidence in respect of their contention in a court of justice is correlative with the duty of all persons to give evidence when called upon to do so.
Our society has, in the statutes creating various privileges, concluded that only in limited areas should the duty to testify be waived. This is done to balance certain rights against others of equal value.
Newspaper reporters and journalists are citizens who conduct a commercial enterprise, one that not only gives them sustenance, but that through its informative powers is basic to the continued existence of our free society. The press is and should continue to be unfettered.
Until recent years there has been no question of the duty of reporters to give evidence if properly called upon to do so. However, recently newspapers and other news recording media have taken a position that their ability to gather the news would be impaired if they were required by subpoena to testify. Although this position is highly speculative, as can be seen from the robust reporting and investigations which have *795 been carried out in the 200 years of our society, there may be some merit to their position in some cases.
However, the complete freedom they seek also has'its dangers. Criminals, or whoever else, may give tangible evidence such as documents indicating crimes to a complaisant reporter or editor under agreement of confidentiality thereby securing it safely from search warrants or subpoenaes.
Other abuses will eventuate. These are no less speculative than the fears expressed by the press.
In substance, the moving parties argued first that they have a right under the First Amendment to the Constitution of the United States, and under its counterpart of the State of New York, to refrain from disclosing any materials which they have acquired in the course of their business of collecting and disseminating news.
Secondly, they argue they have this right under section 79-h of the Civil Rights Law of the State of New York.
The claims of privilege under the First Amendment have been resolved by the Supreme Court in the case of Branzburg v Hayes (408 US 665) where the court said in part (p 690) “We are asked to create another [privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.”
The court not only declined to grant privilege from disclosing what the reporter had seen with his own eyes, but refused to grant the privilege to refrain from disclosing what the source of the information concerning crimes was, stating (p 697): “concealment of crime and agreements to do so are not looked upon with favor. Such conduct deserves no encomium, and we decline now to afford it First Amendment protection by denigrating the duty of a citizen, whether the reporter or informer, to respond to grand jury subpoena and answer relevant questions put to him.”
The right of newspaper reporters, therefore, to refuse to answer questions is based solely on statute or case law in the several States. These laws vary from State to State. Some States have no such laws, and others such as California require the material be published first before a claim of confidentiality of its source may be made. This is obviously, to encourage publication and prevent secrecy. Others, such as Vermont, by case law require a strong showing of necessity.
In New York section 79-h of the Civil Rights Law creates *796 the privilege. However, the privilege does not exist if the newsman is called on to testify what he personally observed. (People v Dan, 41 AD2d 687, app dsmd 32 NY2d 764.)
The Court of Appeals in its memorandum of dismissal stated that no substantial constitutional question was involved.
The privilege does not exist if the material obtained by the newsmen was not intended by the informant to be confidential. That was decided in Matter of WBAI-FM v Proskin (42 AD2d 5).
The privilege, while it might have existed, is waived if, in fact, the newspaper published the material. This was decided in People v Wolff,39 Ad2d 864).
In the present case, not only was the information now sought as the existence of the bullet hole in the bannister, published (although the particular photograph of the hall was not) but it is a clear inference which the court draws from the papers and from the facts known in the case so far that the information was not intended to be confidential, and the taking of the photographs the court concludes was intended for the purpose of publication. The court has offered counsel for the moving parties the opportunity to establish to the contrary, the intent of the informants. I take it that has been declined.
Therefore, the court finds there is no privilege and the motion to vacate the subpoenas is denied.