**SOLARGEN ELECTRIC MOTOR CAR CORP. and Solargen Electronics, Ltd., Plaintiffs,**

v.

**AMERICAN MOTORS CORPORATION, American Motors Sales Corporation and General Motors Corporation, Defendants.**

No. 80–Civ–3809, Misc. No. 410.

United States District Court, N. D. New York.

Jan. 26, 1981.

Romer & Rosenberg, New York City, for plaintiffs; Steven J. Romer, Evelyn F. Cohn, New York City, of counsel.

Bond, Schoeneck & King, Syracuse, N. Y., for defendants; S. Paul Battaglia, Syracuse, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

Underlying the instant motions to quash subpoenas *ad testificandum* and *duces tecum* is a civil antitrust suit instituted by Solargen Electric Motor Car Corporation [SEMC] and Solargen Electronics, Ltd. [SE] against American Motors Corporation [AMC], American Motors Sales Corporation [AMSC] and General Motors Corporation [GM]. The Solargen plaintiffs, which manufacture and market electricity powered vehicles, contend that AMC, AMSC, and GM have conspired to destroy the plaintiffs' business and to deny the plaintiffs any entry into the marketplace. In this regard, certain of the alleged wrongful acts of these defendants concern various manipulations of the news media. For example, paragraph twenty-nine of the complaint states that:

> Upon information and belief, GMC, through its agents, paid large sums of money to various persons as an inducement for having photographers and reporters, wearing hidden microphones, go into Plaintiffs' plant facilities and offices located in Cortland, New York, and to have false and defamatory statements and reports appear on television, on radio, and in newspapers across the United States.

Paragraph fifty-one of the complaint recites the following:

GMC did through its officers, employees and/or agents, engage in a series of "dirty tricks", including the following:

\* \* \* \* \* \*

(b) GMC induced photographers and reporters, wearing hidden microphones, to go into Plaintiffs' plant facilities and offices located in Cortland, New York, without authorization, and to engage in a "fishing expedition", and to thereafter broadcast on nationwide network television, edited and misleading portions of taped conversations.

(c) GMC induced various persons, corporations, reporters and nationwide network television stations to defame Plaintiffs by issuing false, misleading and libelous statements, reports and "documentaries" concerning Plaintiffs' electric vehicle program and Plaintiffs' Lead-Crystal battery.

\* \* \* \* \* \*

GMC engaged in the aforementioned series of "dirty tricks" and in other "dirty tricks" and illegal conduct at this time unknown to Plaintiffs for the express purpose of preventing Plaintiffs from entering the market; such exclusionary conduct was designed to destroy Plaintiffs' business in an illegal attempt to maintain and continue the existing monopoly enjoyed by GMC.

Two of the individuals referred to in these paragraphs are apparently asserted to be Mr. Herbert Weisbaum, a news producer of WSTM television, formerly WSYR television, and Mr. Dean Walters, a cameraman and co-employee of Mr. Weisbaum. Although neither of these individuals is a defendant in the *Solargen* action, these newsmen had been defendants in a libel suit commenced by the *Solargen* plaintiffs. This libel action was dismissed without prejudice by the New York Supreme Court because, *inter alia*, of the plaintiffs' failure to properly allege a cause of action. In the Fall of 1978, Mr. Weisbaum interviewed the President of Solargen, and aired an apparently favorable news story in March, 1979, regarding the plaintiffs' electric car. Subsequently, Mr. Walters entered the plain-

tiffs' facilities, carrying a concealed microphone, and attempted to obtain further information about the electric car. Thereafter, on August 20, 1979, WSTM, formerly WSYR, television aired what the plaintiffs have characterized as "a distorted, false, and malicious documentary, calculated and intended to cause injury to the Plaintiffs." This feature included an interview with Mr. Stanley M. Caulder, who stated that he had been requested by the Department of Energy to review the patents for the plaintiffs' automobile battery. In exchange for broadcasting this story, the plaintiffs contend that Mr. Weisbaum, and/or Mr. Walters, and/or other individuals and entities received monies from GM, the alleged instigator of the apparently unfavorable August 20 feature.

In order to explore its claim concerning the alleged wrongdoing of GM, the *Solargen* plaintiffs served Messrs. Weisbaum and Walters with subpoenas *ad testificandum* and *duces tecum*. These non-party witnesses were requested to appear at designated depositions and to produce all written materials relating to meetings with agents of GM, Newhouse Broadcasting (the owner of WSYR) and Mr. Caulder, where the subject matter of the meetings "concerned, involved, related to, or was in connection with [SE], [SEMC], or the Electric Vehicle industry in general." Additionally, these individuals were ordered to produce at their depositions all personal bank records covering the period from June 1, 1979, through September 30, 1979, the asserted time during which GM allegedly bribed the journalists.

Messrs. Weisbaum and Walters now appear before this Court upon their motion to quash the subpoenas *ad testificandum* and *duces tecum*. The gravamen of their challenge is that the proposed discovery impinges the First Amendment protections accorded to the press. In this regard, Mr. Weisbaum denies ever having any contact or communication with AMC, AMSC, or GM, stating that he discussed the contents of the broadcasts only with employees of the television station. Both newsmen deny receiving any money or other value from GM,

AMC, or AMSC, and Mr. Weisbaum additionally denies paying Mr. Caulder to influence his opinion.

For the reasons set forth below, this Court shall grant in part the motion to quash the subpoenas *ad testificandum* and *duces tecum.*

## II.

■ Pursuant to Fed.R.Civ.P. 45, the subpoenas *ad testificandum* and *duces tecum* supply the procedural predicates for securing the depositions of non-party witnesses. With respect to these subpoenas, the rule provides that the scope of any examination may embrace all matters contemplated by Fed.R.Civ.P. 26(b), subject to the strictures of Fed.R.Civ.P. 26(c). Thus, the sought-after materials must be "relevant to the subject matter involved in the pending action." Rule 26(b). A deponent, however, may seek a protective order from the court against "annoyance, embarassment, oppression, or undue burden or expense ..." Rule 26(c). The burden then rests upon the objecting witness to set forth grounds for the issuance of a protective order, such as the existence of a privilege. *Id. See In re Subpoenas Addressed to Fish and Neave,* 519 F.2d 116 (8th Cir. 1975); *Westinghouse Electric Corporation v. City of Burlington, Vt.,* 351 F.2d 762 (D.C.Cir. 1965); *Biliske v. American Live-Stock Insurance Company,* 73 F.R.D. 124 (W.D.Okl. 1977).

Of course, Rules 45 and 26 do not supply the sole guidance for resolving the given motion. The Court recognizes that the First Amendment question raised by the newsmen places this case in a posture different from that position held by other types of discovery cases.

## III.

Unquestionably, the press's "constitutionally designated function of informing the public," *Zurcher v. Stanford Daily,* 436 U.S. 547, 572, 98 S.Ct. 1970, 1985, 56 L.Ed.2d 525 (1978) (Stewart, J., dissenting), plays a prominent role in our constitutional order. *See, e. g., Herbert v. Lando,* 441 U.S. 153, 183–87, 99 S.Ct. 1635, 1653–54, 60 L.Ed.2d 115 (1979) (Brennan, J., dissenting); *Branzburg v. Hayes,* 408 U.S. 665, 713–15, 92 S.Ct. 2646, 2686–87, 33 L.Ed.2d 626 (1972) (Douglas, J., dissenting). Hence, various aspects of the business of journalism have been accorded unique protection. The editorial process, for example, has enjoyed a long-standing privilege:

A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press, as they have evolved to this time.

*Miami Herald Publishing Company v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974). *Cf: Herbert v. Lando,* 441 U.S. at 167–71, 99 S.Ct. at 1644–46. News gathering, and its attendant system of confidential informants, also has received special recognition. *Richmond Newspapers, Inc., v. Virginia,* —— U.S. ——, 100 S.Ct. 2814, 2830–31, 65 L.Ed.2d 973 (1980) (Stevens, J., concurring); *Branzburg v. Hayes,* 408 U.S. at 682–91, 707, 727–28, 92 S.Ct. at 2657–61, 2669, 2672–73 (Stewart, J., dissenting); *Pell v. Procunier,* 417 U.S. 817, 833, 94 S.Ct. 2800, 2809, 41 L.Ed.2d 495 (1974). In this regard, "[t]he extraordinary protections afforded by the First Amendment carry with them something in the nature of a fiduciary duty to exercise the protected rights responsibly—a duty widely acknowledged but not always observed by editors and publishers." *Nebraska Press Association v. Stuart,* 427 U.S. 539, 560, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976). Moreover, the privileges conferred upon the press are not absolute. *Herbert v. Lando,* 441 U.S. at 169, 99 S.Ct. at 1645; *Branzburg v. Hayes,* 408 U.S. at 682–83, 690–91, 697, 92 S.Ct. at 2657, 2661; *United States v. Cuth-*

bertson, 630 F.2d 139, 146 (3d Cir. 1980); Miller v. Transamerican Press, Inc., 621 F.2d 721, 725–27 (5th Cir. 1980); Farr v. Pitchess, 522 F.2d 464, 467 (9th Cir. 1975), cert. denied, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976); Baker v. F & F Investment, 470 F.2d 778, 783 (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973). "Evidentiary privileges in litigation are not favored and even those rooted in the Constitution must give way in proper circumstances." Herbert v. Lando, 441 U.S. at 175, 99 S.Ct. at 1648 (footnote omitted).

The problem that arises, however, concerns the practical application of a qualified First Amendment press privilege. In general, various formulations of the appropriate standard, usually in the context of the disclosure of confidential sources, have approximated the balancing-of-interests test which predominates constitutional adjudication and whose generalizations are surpassed only by the "expectation of privacy" inquiry under the Fourth Amendment, see Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). See, e. g., Herbert v. Lando, 441 U.S. at 171, 99 S.Ct. at 1646; Branzburg v. Hayes, 408 U.S. at 686, 690, 695, 697, 92 S.Ct. at 2659, 2661, 2663, 2664; Baker v. F & F Investment, 470 F.2d at 783; Garland v. Torre, 259 F.2d 545, 548 (2d Cir.), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958) (Stewart, J., now Justice); United States v. Orsini, 424 F.Supp. 229, 232 (E.D.N.Y.1976), aff'd without opinion, 559 F.2d 1206 (2d Cir.), cert. denied, 434 U.S. 997, 98 S.Ct. 636, 54 L.Ed.2d 491 (1977). Thus, lower court standards have broadly resembled the test articulated by Mr. Justice Powell in Branzburg:

The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

In short, the courts will be available to newsmen under certain circumstances where legitimate First Amendment interests require protection.

Branzburg v. Hayes, 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring), quoted in Baker v. F & F Investment, 470 F.2d at 784. Cf: Herbert v. Lando, 441 U.S. at 179, 99 S.Ct. at 1650 (Powell, J., concurring) ("Whatever standard may be appropriate in other types of cases, when discovery demand arguably impinges on First Amendment rights, a district court should measure the degree of relevance required in light of both the private needs of the parties and the public concerns implicated"). The Ninth Circuit has implicitly adopted the following formulation of this "balancing" approach:

The application of the Branzburg holding . . . seems to require that the claimed First Amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts and a balance struck to determine where lies the paramount interest.

Farr v. Prichess, 522 F.2d at 468. Other Circuits have basically adhered to the approach followed in the Second Circuit, which standard inquires into the nature, relevancy, materiality, and necessity of the information; the reasonable availability of alternative means to obtain the information; and the extent to which the inquiry goes to the heart of the movant's claim. See Baker v. F & F Investment, 470 F.2d at 783–84; Garland v. Torre, 259 F.2d at 550; Montezuma Realty v. Occidental Petroleum, 494 F.Supp. 780 (S.D.N.Y.1980). Compare Miller v. Transamerican Press, Inc., 621 F.2d 721, 726 (5th Cir. 1980); Silkwood v. The Kerr-McGee Corporation, 563 F.2d 433, 438 (10th Cir. 1977); Carey v. Hume, 492 F.2d 631, 636–37 (D.C.Cir.), pet. for cert. dismissed, 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974). Cervantes v. Time, Inc., 464 F.2d 986, 991–92 (8th Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973). Cf: New York Times Company v. Jascalevich, 439 U.S. 1331, 1335, 99 S.Ct. 11, 14, 58 L.Ed.2d 38 (1978) (Marshall, J., in chambers). In this regard,

the District of Columbia Circuit has also noted the importance of "evaluat[ing] the likelihood of any chilling effect . . ." *Community-Service Broadcasting v. Federal Communications Commission*, 593 F.2d 1102, 1118 & n. 38 (D.C.Cir.1978). Although substantially in conformity with the Second Circuit, the Third Circuit has added a more stringent requirement, namely, that the movant demonstrate "that the *only* access to the information sought is through the journalist and her sources." *United States v. Criden*, 633 F.2d 346, 359, (emphasis supplied) (3d Cir., 1980). *See id.* at 359; *Riley v. City of Chester*, 612 F.2d 708, 716–17 (3d 1979). The First Circuit has adopted a somewhat modified *Torre* test, requiring a court to balance the relevancy or need for the information—a burden to be carried by the plaintiff—against the need for confidentiality—a burden to be carried by the defendant. *See Bruno & Stillman v. Globe Newspaper*, 633 F.2d 583, 597–98 (1st Cir. 1980). *See Mize v. McGraw Hill, Inc.*, 86 F.R.D. 1, 1, 2 (S.D.Tex.1980) (citing *Garland v. Torre, supra*). *Cf: Gilbert v. Allied Chemical Corp.*, 411 F.Supp. 505, 511 (E.D. Va.1976) (need for confidentiality).

 Finally, although under Fed.R. Evid. § 501 state privileges are not controlling in this proceeding, state law is nonetheless relevant. *See, e. g., Riley v. City of Chester,* 612 F.2d at 715; *Baker v. F & F Investment*, 470 F.2d at 781–82; *Gulliver's Periodicals, Ltd. v. Chas. Levy Circulating Company, Inc.*, 455 F.Supp. 1197, 1200–01 (N.D.Ill.1978); *Apicella v. McNeil Laboratories, Inc.*, 66 F.R.D. 78, 83–84 (E.D.N.Y. 1975). New York Civil Rights Law § 79–h provides that "no professional journalist or newscaster . . . shall be adjudged in contempt by any court . . . for refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news . . ." Under this "shield" statute, which is strictly construed, *see Andrews v. Andreoli*, 92 Misc.2d 410, 416–21, 400 N.Y.S.2d 442, 446–49 (Sup.Ct., 1977), a privilege attaches to gathered news only when the information is communicated to a newsman, or cameraman, see *People by Fischer v. Dan*,

41 A.D.2d 687, 688, 342 N.Y.S.2d 731, 732–33 (4th Dep't.), *appeal dismissed*, 32 N.Y.2d 764, 298 N.E.2d 118, 344 N.Y.S.2d 955 (1973), under a cloak of confidentiality: the burden of proof of this confidentiality rests, as under the First Circuit standard, upon the journalist. *See, e. g., WDAI–FM v. Proshin*, 42 A.D.2d 5, 6–7, 344 N.Y.S.2d 393, 394–95 (3d Dep't. 1973); *People v. Wolf*, 39 A.D.2d 864, 333 N.Y.S.2d 299, 301 (1st Dep't. 1972); *Application of Dack*, 101 Misc.2d 490, 499, 421 N.Y.S.2d 775, 782 (Sup. Ct., Monroe Co. 1979); *Andrews v. Andreoli*, 92 Misc.2d at 417, 400 N.Y.S.2d at 447; *People v. Dupree*, 88 Misc.2d 791, 795, 388 N.Y.S.2d 1000, 1003 (Sup.Ct., N. Y. Co. 1976). Moreover, Section 79–h is not applicable where the journalist is called upon, as other citizens, to testify with respect to personal observations. *People by Fischer v. Dan*, 41 A.D.2d at 688, 342 N.Y.S.2d at 732–33; *People v. Dupree*, 88 Misc.2d at 795, 388 N.Y.S.2d at 1003.

It is against this background that the Court shall consider the motion to quash.

### IV.

In support of their argument that they ought not be compelled to testify or to produce the requested documents, Messrs. Weisbaum and Walters initially maintain that compulsory process inevitably has a chilling effect on first amendment freedoms. Citing *E. G. Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 544, 83 S.Ct. 889, 892, 9 L.Ed.2d 929 (1963). The newsmen go on to make the broad argument that the plaintiffs have failed to satisfy the various criteria under the balancing approach that governs the adjudication of First Amendment claims.

Responding to these statements, the *Solargen* plaintiffs essentially argue that insofar as their claims involve reprehensible journalistic conduct, full discovery is permissable. Citing *Branzburg v. Hayes, supra*. Furthermore, they effectively contend that no alternative sources of information are available because GM, a *Solargen* defendant and alleged payor of any "bribes",

would "obviously" not admit to making any payments, and because a search of all the bank records of GM would be infeasible. Finally, these plaintiffs argue that they are not seeking the identity of any confidential sources, but proof of their "pay-off" allegations.

■ As a threshold matter, this Court must first resolve an issue that arose during oral argument, namely, whether a cameraman, like Mr. Walters, may invoke a First Amendment privilege. Insofar as camerapersons in fact gather news, albeit with electric equipment, as well as disseminate information, such individuals reasonably should share the same privilege enjoyed by traditional journalists. *See People by Fischer v. Dan*, 41 A.D.2d 687, 342 N.Y.S.2d 731 (4th Dep't. 1973).

■ Turning, then, to the contested subpoenas *ad testificandum*, the Court is greatly bothered by the unreasonable refusal of the journalists to even appear at their designated depositions, particularly from people who belong to a profession that continually espouses the people's right to know. These reporters cannot refuse to appear, and must instead respond to the subpoenas and assert whatever privilege they may properly invoke in response to particular questions. *See Silkwood v. The Kerr-McGee Corporation*, 563 F.2d at 436–37. *Rosario v. The New York Times Company*, 84 F.R.D. 626, 631 (S.D.N.Y.1979). To maintain otherwise would go against the duty "which the citizen owes his government . . . to support the administration of justice by . . . giving his testimony whenever he is properly summoned." *Blackmur v. United States*, 284 U.S. 421, 438, 52 S.Ct. 252, 255, 76 L.Ed. 375 (1932), *quoted in In re Consumer's Union of United States, Inc.*, 27 F.R.D. 251, 253 (S.D.N.Y.1963). *See Branzburg v. Hayes*, 408 U.S. at 682, 690–91, 92 S.Ct. 2657, 2661.

Of course, the Court is aware of the admonition of other federal tribunals that the questioning of journalists must not amount to a mere fishing expedition. *See, e. g., Herbert v. Lando*, 441 U.S. at 174, 99 S.Ct. at 1648; *Bruno & Stillman v. Globe Newspapers*, 633 F.2d at 597; *Silkwood v. The Kerr McGee Corporation*, 563 F.2d at 438. Given the present posture of this discovery proceeding, however, the Court is not inclined to make the altogether unfounded assumption that all of the plaintiffs' intended questions are frivolous, immaterial, or subject to the strictures of the First Amendment. Additionally, the Court recognizes that when a non-party journalist is the target of a subpoena in a civil proceeding, as opposed to a criminal action, the First Amendment balance may, in specific situations, shift in favor of non-disclosure. *See, e. g., Baker v. F & F Investment*, 470 F.2d at 785. This is not to say that civil discovery rules must always give way to the First Amendment. *See Herbert v. Lando*, 441 U.S. at 177, 99 S.Ct. at 1648. *Cf: Id.* at 180, 99 S.Ct. at 1651 (Powell, J., concurring) ("On the other hand, there also is a significant public interest in according to civil litigants discovery of such matters as may be genuinely relevant to their lawsuit."). Such a *per se* approach was implicitly rejected by the Supreme Court in its formulation of a balancing-of-interests test, which necessarily contemplates a case-by-case evaluation of the relevant interests at stake. Statements by other courts, however, unfortunately suggest that this articulation by the Supreme Court of a flexible standard has fallen on deaf ears. For example, in the context of reviewing a discovery request against a non-party journalist in a civil antitrust case, one federal court applying a balancing test, made the observation that:

> if [the press] is susceptible to being drawn into private disputes between commercial or other institutional entities simply because [it] has expressed an opinion favorable to the successful resolution of the dispute in favor of one side or the other, a significant burden will be placed on [its] coverage of provocative issues important to the public.

*In re Consumer's Union*, 495 F.Supp. 582, 6 Med.L.Rptr. 1681, 1683 (S.D.N.Y.1980). Such reasoning indicates that, as applied by other courts, the flexible balancing criteria

may lead to the adoption of inflexible principles. *See National Nutritional Foods Ass'n. v. Whelan*, 492 F.Supp. 374, 378–79 (S.D.N.Y.1980).

Accordingly, whatever the approaches of other lower federal courts, and given the absence of any evidence of oppression or undue burden or hardship, *see* Fed.R.Civ.P. 26, Messrs. Weisbaum and Walters are ordered to appear at their respective depositions, asserting at those proceedings any legitimate objections that they may care to voice.

■ With respect to the subpoena *duces tecum*, the Court concludes that the plaintiffs have met the requirements for obtaining the production of the newsmen's personal bank records. Contrary to the arguments of the journalists, this Court finds no basis for the assertion of a legitimate First Amendment privilege that would prohibit the discovery of such personal papers. Neither these records, nor their production, appears to interfere with any newsgathering or news dissemination activities of the journalists, and it is only these processes that receive First Amendment protection. Moreover, even if there were a "chilling" effect, it would be offset by the plaintiffs' satisfaction of the factors that a court must examine in balancing the First Amendment interests against the interest of the party seeking disclosure. "[T]he First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil ... statutes of general applicability." *Branzburg v. Hayes*, 408 U.S. at 682, 92 S.Ct. at 682. In this regard, the bank records are certainly relevant and material to the plaintiffs' case against GM, and indeed goes to the very heart of the plaintiffs' conspiracy claim that the defendant automobile manufacturer bribed journalists to disparage the plaintiffs' product. *Cf: Carey v. Hume*, 492 F.2d at 636 n. 19; *Garland v. Torre*, 259 F.2d at 558. Moreover, the plaintiff has demonstrated that the materials are necessary to the maintenance of their civil antitrust suit, and that alternative sources are unavailable. *Cf: Baker v. F & F Invest-*

*ment*, 470 F.2d at 783, 784. Not only has GM specifically denied the averments contained in paragraphs twenty-nine and fifty-one of the complaint, *see* GM Answer at Paragraphs Nine and Sixteen, but also this Court would be ignoring common sense and experience if it required the plaintiff to depose the President and Chairman of the Board of GM before seeking discovery of the journalists. For these reasons, and in the absence of any evidence of oppression or undue hardship or burden, *see* Fed.R. Civ.P. 26, the newsmen are ordered to comply with the plaintiff's request for the production of personal banking papers.

■ The subpoena *duces tecum* addressed to the production of materials relating to meetings with representatives of GM, Newhouse Broadcasting, and Mr. Caulder, where the topic of any discussions concerned SE, SEMC, or the general electric vehicle industry, raises different considerations. Certainly, as discussed above, the plaintiffs have established their right to discovery of any specified writings made during the course of or after any meeting with representatives of GM. The request for papers relating to meetings with individuals of Newhouse Broadcasting, however, unlike the production of personal bank records, directly implicates legitimate First Amendment interests, specifically the news editorial process. *See Herbert v. Lando, supra.* In the judgment of this Court, the plaintiffs have failed at this time to satisfy the requirements of exploring alternative sources. This same criticism of the plaintiffs' efforts also applies to the production of papers in regard to Mr. Caulder. Accordingly, the motion to quash the subpoenas *duces tecum* is granted to the extent that it is made in opposition to the production requests of materials relating to meetings with persons affiliated with Newhouse Broadcasting and with Mr. Caulder. In all other respects, the motion to quash is denied, given the absence of any evidence regarding undue hardship or oppression, *see* Fed.R.Civ.P. 26.

## V.

For the foregoing reasons, the motion to quash the subpoenas *ad testificandum* is

denied at this time. The motion to quash the subpoenas *duces tecum* is granted in part, and denied in part at the present time.

It is so ordered.