**UNITED STATES of America Plaintiff**

v.

**Thomas Jay "T J" HIVELY Defendant**

**No. 4:00CR00187(1).**

United States District Court,
E.D. Arkansas,
Little Rock Division.

March 4, 2002.

Samuel A. Perroni, Perroni & James, Little Rock, AR, for Petitioner.

Todd Lister Newton, Angela S. Jegley, U.S. Attorney's Office, Little Rock, AR, for Respondent.

### ORDER REGARDING MOVANTS SANDY DAVIS AND THE ARKANSAS DEMOCRAT–GAZETTE'S JOURNALISTIC PRIVILEGE CLAIM

MOODY, District Judge.

Movants Sandy Davis and the *Arkansas Democrat–Gazette* ("ADG") (collectively,

"Movants") have moved to limit the scope of her testimony in this trial. Ms. Davis has been subpoenaed by the United States as a possible rebuttal witness and by Mr. Hively as a defense witness. The Court conducted a preliminary hearing on this issue on Tuesday, February 19, 2002.[1] At the conclusion of the hearing, Movants' counsel advised that if called to testify in this criminal trial, Ms. Davis would refuse to answer certain questions proposed by the defense pursuant to a claim of "journalistic privilege." Movants' counsel further advised that Ms. Davis would decline to answer these questions even if directed to do so by the Court.

For the reasons that follow, Ms. Davis is directed to appear and be prepared, consistent with this opinion, to testify in this case or to suffer the consequences of refusing to testify.

### FACTUAL BACKGROUND

During Tuesday's hearing, Ms. Davis was not present. The Court has not yet heard from Ms. Davis, but has only heard argument by Movants' counsel and testimony of a general nature from David Bailey, ADG Managing Editor. Mr. Bailey testified concerning the importance to the press of protecting against the identification of confidential sources. Mr. Bailey

lacked any personal knowledge of Ms. Davis' involvement in this case, her likely testimony, or the potential relevance of her testimony.[2]

Movants argue in their briefs that Ms. Davis should only be permitted to testify concerning the truth and accuracy of her articles appearing in the ADG, which the prosecution purports to elicit in rebuttal testimony.[3] Movants' effort to limit Ms. Davis' testimony relates solely to her testimony if called by the defense. As a threshold matter, defense counsel outlined the following proposed areas of inquiry for Ms. Davis:

(1) when she wrote the 20–25 articles published in the ADG from October 1997 through May 16, 1998;

(2) whether she was present at certain public places and whether she was accompanied by other members of the media; and

(3) the identification and accuracy of quotes appearing in articles written by Ms. Davis and attributed to witnesses in this case (for impeachment purposes of other witnesses who have testified in this case).

After a discussion concerning these general areas of inquiry, Movant's counsel proposed that defense counsel be required

1. This trial started on January 24, 2002, and is still pending. The Government rested its case-in-chief on March 1, 2002. The defense is scheduled to begin its proof on Wednesday, March 6, 2002. The delay in resuming the trial is due in part to six substantial defense motions which must be addressed before the trial resumes.

2. Movants' counsel also questioned the relevance of Ms. Davis' purported testimony, stating that from reading about the trial in the newspaper he could not imagine how anything Ms. Davis might have to say could possibly be relevant to the trial of this case. Movants certainly did not intend to suggest that the judgment of a non-party movant about the relevance of a reporter's testimony

based upon a review of newspaper articles can serve as a substitute for this Court's independent judgment concerning the relevance of her testimony. *See* discussion, *infra* regarding the relevance of Ms. Davis' testimony.

3. The notion that Ms. Davis could limit her testimony to these self-serving statements is misguided for an additional reason. The Confrontation Clause of the Sixth Amendment guarantees Hively the opportunity to test the believability and truth of any witness offered by the prosecution. If Ms. Davis were to testify as a government rebuttal witness, Hively would certainly be permitted to inquire into Ms. Davis' bias, prejudice or suspect motives as they relate to any issues or individuals in this case.

to submit a specific list of proposed questions so that Movant's counsel could review those questions with Ms. Davis.[4] After a brief recess to permit defense counsel to write out his proposed questions for Ms. Davis, Movant's counsel was given a list of 14 proposed questions for Ms. Davis. (Petitioner's Exhibit B, attached to this Order as Exhibit 1). Purposefully omitted from the proposed list of questions were the verifications of quoted sources in the articles, which the parties agree will be allowed as relevant to impeach witnesses who have already testified in this case, and questions concerning when Ms. Davis wrote her articles, to which Movants object as invading the "editorial process."

A second recess was taken to allow Movants' counsel to consult with Ms. Davis by telephone to review the questions proposed by the defense. When the hearing resumed, Movant's counsel announced to the Court that Ms. Davis would answer proposed questions 1, 3 and 4, but "would respectfully decline to answer" questions 2, 5, and 6–14. For cause, Movant's counsel stated that answering these questions "would be inconsistent with Ms. Davis' professional responsibilities as a journalist." (Transcript of Feb. 19th Hearing).

The Court specifically inquired but was given no additional information concerning why Ms. Davis was electing to refuse to answer the majority of the questions posed by the defense. Movants' counsel argued that a newspaper reporter's privilege is analogous to the attorney-client privilege and that "just as with questions of attorney client privilege we have to rely . . . on how the lawyer answers on whether any particular information is privileged, so we must do with reporters." (Transcript of Feb. 19th Hearing). Movants' apparent position is that once a journalist invokes a privilege, that ends any further inquiry into the matter.[5]

Thus, at this point the Court knows nothing more than that Ms. Davis believes that she should not have to answer these questions and that she intends to refuse to answer these questions even if ordered to do so by this Court. Defendant contends that he is not seeking to elicit information concerning confidential sources or other confidential information and thus, that no privilege exists.

## PROCEDURE AND BURDEN OF PROOF FOR ESTABLISHING AND ASSESSING PRIVILEGE CLAIMS

The Court confesses to being somewhat troubled by the procedure to this point. A reporter has been subpoenaed to appear and give testimony in this criminal case. The reporter has not appeared before this Court, nor has she presented affidavit testimony. Defense counsel has disclosed the specific questions he proposes to ask the reporter. The proposed questions are relevant, in this Court's judgment, to the defense, and do no not require the reporter to disclose confidential sources or other confidential information. The Court has been deprived of the opportunity to examine the reporter concerning the parameters of her testimony or the basis for her refusal to answer certain questions. Yet, the reporter has advised through her counsel that she is refusing to answer these questions.

Movants have the burden to demonstrate the existence of a privilege which justifies limiting Ms. Davis' testimony. *See Bruno & Stillman, Inc. v. Globe News-*

---

4. Although the Court permitted this procedure, it is unlikely to do so in any future proceedings of this nature.

5. If accepted, this would have the effect of elevating a reporter's qualified privilege to an absolute privilege. The Court knows of no authority for such a position.

*paper Co.*, 633 F.2d 583, 597 (1st Cir.1980)(media defendant has "the burden of establishing need for preserving confidentiality" although "party seeking discovery of media defendant's confidential sources must establish relevance of the desired information."); *See also Liberty Lobby, Inc. v. Anderson*, 96 F.R.D. 10, 12 (D.D.C.1982)(the existence of a qualified constitutional reporter's privilege "does not mean that a journalist can deprive his opponent and the court of relevant information to determine whether the qualified privilege is being properly invoked.")

■ Movants' bare assertion that certain testimony may implicate confidential sources or information is insufficient to satisfy their burden on this issue. "Vague allegations of potential indication of confidential sources will not suffice" to support a claimed qualified reporter's privilege. *Gilbert v. Allied Chemical Corp.*, 411 F.Supp. 505, 511 (E.D.Va.1976). Movants must provide the court with particularized allegations or facts to support a privilege claim. This burden has not been met with respect to Ms. Davis.

The Court holds that Ms. Davis must appear in person before this Court to assert her privilege, and that she must do so in the context of responding to particular questions. In the context of a reporter's refusal to appear for deposition in a civil case, one court stated:

> [T]he Court is greatly bothered by the unreasonable refusal of the journalists to even appear at their designated depositions, particularly from people who belong to a profession that continually espouses the people's right to know. These reporters cannot refuse to appear, and must instead respond to the subpoenas and assert whatever privilege they may properly invoke in response to particular questions.

*Solargen Electric Motor Car Corp. v. American Motors Corp.*, 506 F.Supp. 546, 552 (N.D.N.Y.1981). *See also Silkwood v. The Kerr–McGee Corporation*, 563 F.2d 433, 437 (10th Cir.1977)("[A] reporter must respond to a subpoena ... [and] he must appear and testify. He may, however, claim his privileges in relationship to particular questions which probe his sources.").

The Court's ruling at this time is to deny Movants' motion. The Court will, however, consider these issues further in an *in camera* hearing with Ms. Davis immediately prior to her testimony in this case should Movants' wish to present a more particularized showing to support their privilege claim.

## APPLICABLE LAW

Federal courts continue to be divided on the issue of whether and under what circumstances to recognize a news reporters' privilege to refuse to divulge the identity of confidential sources, confidential information, or nonconfidential unpublished information. There are two potential sources of the privilege—the First Amendment or Fed.R.Evid. 501. Most cases have focused on the existence and scope of a constitutionally based reporter's privilege. The Court will consider both sources of privilege.

The general principle obligating all witnesses to appear and provide relevant testimony is well established in the law.

> "For more than three centuries it has now been recognized as a fundamental maxim that the public (in the words sanctioned by Lord Hardwicke) has a right to every man's evidence. When we come to examine the various claims of exemption, we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, be-

ing so many derogations from a positive general rule."

*United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950)(quoting 8 J. Wigmore, *Evidence* § 2192 (3d ed.1940)).

## 1. FIRST AMENDMENT REPORTER'S PRIVILEGE

■ Evaluating the scope and extent of a constitutionally based news reporters' privilege necessarily begins with an examination of *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). In *Branzburg,* the Court refused to recognize a qualified newspapers' privilege to shield confidential source information from grand juries in the absence of bad faith.[6] Justice White, writing for the majority, specifically declined to recognize a testimonial privilege for reporters rooted in the First Amendment, stating:

> Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.

*Branzburg,* 408 U.S. at 689–90, 92 S.Ct. at 2661.

Justice Powell, writing alone in a three paragraph concurring opinion, wrote to emphasize "the limited nature of the Court's holding," stating that the Court was not holding "that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of the news or in safeguarding their sources." In conclusion, Justice Powell promised: "the courts will

be available to newsmen under circumstances where legitimate First Amendment interests require protection." *Branzburg,* 408 U.S. at 709–10, 92 S.Ct. at 2670–671.

Following the *Branzburg* decision, numerous courts construed *Branzburg* as supporting a qualified privilege for reporters based on the First Amendment, including courts considering the issue in the context of a criminal case. *See United States v. Burke,* 700 F.2d 70, 77 (2nd Cir. 1983), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983)(refusing to draw a distinction between civil and criminal cases when considering a reporter's interest in confidentiality); *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981)(considering subpoena for documentary materials). Subsequent cases, however, began to question whether *Branzburg* could be interpreted so expansively.

In 1987, the Sixth Circuit became the first federal court to point out that to interpret *Branzburg* as creating a privilege grounded in the First Amendment "would be tantamount to ... substituting, as the holding of *Branzburg,* the dissent written by Justice Stewart (joined by Justices Brennan and Marshall) for the majority opinion." *In re Grand Jury Proceedings,* 810 F.2d 580, 583–86 (6th Cir.1987)(analyzing Justice Powell's concurrence in the context of the majority opinion). The Sixth Circuit observed:

> Perhaps Justice Powell's use of the term "privilege" has provided too great a temptation for those inclined to disagree with the majority opinion.... "[T]his balancing of interest should not then be

---

**6.** *Branzburg* involved four separate cases, each involving a journalist who had been held in contempt for failure either to appear, or to testify, before grand juries which were investi-

gating criminal conduct as to which the reporters had secured information in the process of preparing stories for publication in newspapers.

elevated on the basis of semantical confusion, to the status of a first amendment constitutional privilege."

*Id.,* 810 F.2d at 585–86.

Another district court from Arkansas rejected a constitutional reporters' privilege in refusing to quash a grand jury subpoena from independent counsel Kenneth Starr for out-takes from ABC's interview with Whitewater figure Susan McDougal. *In re Grand Jury Subpoena American Broadcasting Companies, Inc.,* 947 F.Supp. 1314, 1318–20 (E.D.Ark.1996). Chief Judge Susan Webber Wright, relying on *Branzburg,* held that in the absence of a showing that the subpoena was issued in bad faith or for purposes of harassment, that the information sought had a remote and tenuous relationship to the subject of the investigation, or that the Independent Counsel lacked a legitimate need for the information, no First Amendment concerns were implicated. *Id.,* at 1320. Although Judge Wright rejected the applicability of the three-part balancing test advocated by ABC, she also held that applying the test would yield the same result. *Id.*

This case, of course, involves a criminal trial rather than a grand jury proceeding. Because the proponent of the evidence is a criminal defendant, however, other constitutional issues come into play. Hively's Sixth Amendment right to present a defense must also be factored into the analysis. That right certainly has equal or higher status than the public interest in exposing criminal conduct commonly referenced in the grand jury cases.

In the context of a criminal prosecution, some courts have concluded that news reporters enjoy no constitutional privilege where the information sought is nonconfidential. In *U.S. v. Smith,* 135 F.3d 963 (5th Cir.1998), the court permitted the government to subpoena untelevised portions of a videotaped interview with the defendant. The court in *Smith* found it

unnecessary to apply any balancing test and determined the admissibility of the evidence solely based upon its relevance in the case.

In *United States v. King,* 194 F.R.D. 569 (E.D.Va.2000), the court rejected a television station and its reporter's effort to quash a subpoena duces tecum for unedited, unbroadcast videotapes of the reporter's interview of government witnesses in a criminal case. Tracing *Branzburg*'s evolution and relying heavily on Sixth Circuit opinion in *In re Grand Jury Proceedings, supra,* the court noted:

> [D]istrict courts must make, on a case-by-case basis, a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony "by determining whether the reporter is being harassed in order to disrupt his relationship with confidential news sources, whether the grand jury's investigation is being conducted in good faith, whether the information sought bears more than a remote and tenuous relationship to the subject of the investigation, and whether a legitimate law enforcement need will be served by forced disclosure of the confidential relationship."

*King,* 194 F.R.D. at 581–82 (quoting *Branzburg,* 408 U.S. at 685, 92 S.Ct. 2646).

Another Fourth Circuit opinion, *In re Shain,* 978 F.2d 850 (4th Cir.1992), considered *Branzburg* in the context of reviewing and affirming the contempt convictions of four reporters who refused to testify in a criminal trial about matters learned by the reporters during their news gathering activities. There the government subpoenaed the reporters to testify that the defendant had in fact made certain statements that they had reported, which was relevant to the defendant's intent. *Id.* at 851–52. The reporters moved to quash the subpoenas on First Amendment

grounds. The district court denied the motions to quash. The reporters refused to testify and were held in contempt and ordered confined during each of the two days of trial. In affirming the district court's ruling, the Fourth Circuit held:

> [W]e hold that the incidental burden on the freedom of the press in the circumstances of this case does not require the invalidation of the subpoenas issued to the reporters, and absent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution.

*Id.* at 852.

Whether *Branzburg* establishes a qualified news reporter's privilege is an open issue in this Circuit, as the Eighth Circuit Court of Appeals has specifically noted. *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 918 n. 8 (8th Cir.1997) (citations omitted), *cert. denied sub nom., Office of President v. Office of Independent Counsel,* 521 U.S. 1105, 117 S.Ct. 2482, 138 L.Ed.2d 991 (1997)(parenthetically referencing *Branzburg* as "rejecting news reporter's privilege.").

On the specific facts of this case and in the absence of any showing that this information is sought in bad faith or for purposes of harassment, this Court declines to recognize any constitutional privilege concerning the nonconfidential testimony sought by the defense. The issue becomes strictly one of relevance. The Court finds that the limited testimony sought from Ms. Davis is sufficiently relevant to the defense to be admissible. Further, even if the Court were to find it appropriate to apply a balancing test, the balance on these facts weighs in favor of permitting the testimony. *See Gonzales v. National Broadcasting Co., Inc.,* 194 F.3d 29, 36 (2nd Cir.1999)(upholding journalist's privilege with regard to nonconfidential press materials, but holding that such a privilege would be easier to overcome; privilege would be lost if party seeking materials could demonstrate that the materials at issue were of likely relevance to a significant issue in the case and were not reasonably obtainable from other available sources).

## 2. REPORTERS' PRIVILEGE UNDER FED. R. EVID. 501:

■ Although the First Amendment has been focused on by courts and litigants as the primary source of a reporter's privilege, it is not the only source. Federal Rule of Evidence 501 "authorizes federal courts to define new privileges by interpreting 'common-law principles ... in the light of reason and experience.'" *Jaffee v. Redmond,* 518 U.S. 1, 8, 116 S.Ct. 1923, 1927, 135 L.Ed.2d 337 (1996). Privileges, as exceptions to the general rule, "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974).

The Court in *Jaffee* recognized a common-law privilege to protect confidential communications between psychotherapists and their patients. In determining whether to do so, the Court considered whether recognition of the privilege would promote "'sufficiently important interests to outweigh the need for probative evidence....'" *Jaffee,* 518 U.S. at 9–10, 116 S.Ct. at 1928 (omitting citation). The Court found that recognition of a psychotherapist-patient privilege would serve the important private interest of promoting an atmosphere of confidence and trust necessary for successful treatment. The Court was further influenced by the fact that "all 50 States and the District of Columbia have enacted into law some form of psychotherapist privilege" and that the Judi-

cial Conference Advisory Committee specifically recommended to Congress that such a privilege be recognized as part of the Proposed Federal Rules of Evidence. *Jaffee*, 518 U.S. at 10, 12, 116 S.Ct. at 1928–29.

The *Jaffee* Court rejected the notion that the psychotherapist-patient privilege could be overcome by a balancing test, but it declined to delineate the "full contours" of the privilege, noting that: "[a] rule that authorizes the recognition of new privileges on a case-by-case basis makes it appropriate to define the details of new privileges in a like manner." *Jaffee*, 518 U.S. at 17–18, 116 S.Ct. at 1932.

Movants also argue that the Court should recognize a reporter's testimonial privilege under Rule 501 to protect "the editorial process and confidentiality of sources and information provided to investigative journalists at least in the context of investigating possible public corruption." (Movants' brief at p. 8.). Under the facts of this case, the Court declines to recognize such a privilege.

As the Supreme Court has explained, evidentiary privileges "are rooted in the imperative need for confidence and trust." *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980)(rejecting proposed privilege for accused against adverse spousal testimony because "its protection is not limited to confidential communications"); see Note, *Making Sense of Privilege Under the Structural Logic of the Federal Rules of Evidence*, 105 Harv. L.Rev. 1339, 1343–45 (1992) (explaining that all privileges recognized under Fed.R.Evid. 501 are based on confidentiality and relationships of trust).

Again, this Court views the information sought by the defense as relating only to nonconfidential information. The proposed testimony will not impact confidentiality nor intrude into any relationship of trust. Accordingly, on the facts before it, the Court declines to recognize a common law reporters' privilege.

### 3. OTHER SOURCES OF PRIVILEGE:

■ Movants' reliance on Arkansas' shield law is without merit. State law prohibits inquiry into a journalist's confidential sources unless it is first shown that the article was published "in bad faith, with malice, and not in the interest of a public welfare." Ark.Code Ann. § 16–85–510. State law privileges have no applicability to this federal proceeding. *See In re Grand Jury Subpoena American Broadcasting Companies, Inc.*, 947 F.Supp. 1314, 1321 (E.D.Ark.1996)(finding state law privileges inapplicable to a federal grand jury subpoena); *In re Zuniga*, 714 F.2d 632, 636 (6th Cir.1983)("inasmuch as the subpoenas in issue are the product of a federal grand jury investigation into alleged violations of federal criminal law, questions of privilege are governed by federal law"), *cert. denied*, 464 U.S. 983, 104 S.Ct. 426, 78 L.Ed.2d 361 (1983). Finally, even if the Court were to apply the provision, it would not resolve the present issues because the state statute is limited to the disclosure of "the source of information" and the testimony at issue in this case concerns no source information.

### DISCUSSION

The Court recognizes the potential relevance of this testimony to the defense. From opening statements in this case, the defense has asserted that this prosecution is malicious and politically inspired. Hively has alleged that his political opponents used the media to wage a smear campaign against him, ultimately resulting in this prosecution. Dan McDonald, the Director of the Child Support Enforcement Program for the State of Arkansas, testified that he began talking to newspaper report-

ers approximately six weeks before it was mutually decided to terminate the child support enforcement contract with the State of Arkansas and the 16th Judicial District Prosecuting Attorneys' Office. He further testified before the grand jury that his decision to terminate the contract in April of 1998 was based on several discussions he had with newspaper reporters. Mr. McDonald testified that he spent several hours with reporters going over their findings.

On April 27, 1998, when Mr. Hively arrived at the State offices to meet with Mr. McDonald to terminate the contract, ADG reporters Sandy Davis, Jeff Porter, and a photographer were waiting on him. Mr. McDonald testified that he did not contact the press to advise them of the meeting and didn't know how they knew about it.

This Court is not insensitive to the value of a free press in our society or the need to protect its role in investigating crimes and gathering news. The Court also recognizes a public interest in protecting the autonomy and neutral role of the press as an instrument of public information. The core of the defense, however, is that these reporters did not act in a neutral fashion, but that they conspired with Hively's political opponents to have these allegations aired in the press in the six months leading up to Hively's reelection effort in May of 1998. The Court cannot say that this contention is without any foundation in the record or that it is completely irrelevant to whether Hively in fact committed the crimes with which he is charged.[7] Finally, there is no evidence that the defense seeks this information in bad faith or for purposes of harassment.

Another factor weighing in favor of allowing this testimony is its narrow focus. Hively is not requesting that Ms. Davis

reveal confidential sources or that she turn over notes or other unpublished materials. Defendant is not engaging in a fishing expedition. Nor is he using a broad sweeping subpoena to obtain a vast array of irrelevant information.

Further, even if it were appropriate to apply a balancing test in this matter, based upon the information before the Court, the balance weighs in favor of overcoming any privilege that might exist. The Sixth Amendment rights of the Defendant weigh heavily in this analysis, and would likely tip the scales in favor of the defense even if a privilege were found to exist. Defendant has a right to present a defense to the charges against him. Movants's disagreement with the merits of the defense is insufficient to deny Defendant the right to present his theory to the jury charged with evaluating his guilt or innocence.

Based upon the information the Court has been provided to this point and a review of applicable law, the Court declines at this point to recognize any testimonial privilege with respect to the proposed testimony of Ms. Davis. Ms. Davis is directed to appear and answer the questions proposed by the defense, including the 14 questions listed in Exhibit 1 to this Order, questions concerning the timing of when Mr. Davis wrote her articles, and questions related to the accuracy of quotes attributed by Ms. Davis in her articles to other witnesses in this case.

## CONCLUSION

For the reasons stated herein, in the absence of a more particularized showing by Movants, the Court finds that the proposed testimony of Ms. Davis is not privileged, that it is potentially relevant to the defense asserted by Hively, and that the

---

7. Pending before the Court are several defense motions, one of which alleges that the prosecution has failed to demonstrate that

Hively possessed the requisite criminal intent to commit the crimes with which he is charged.

questions should be answered. Ms. Davis is hereby directed to appear before this Court to give testimony in this case. Ms. Davis is further advised that the Court is prepared to exercise its inherent contempt powers if she declines to testify in spite of being directed to do so by this Court.[8] Accordingly,

IT IS THEREFORE ORDERED that the Motion to Limit Testimony filed by Movants' Sandy Davis and the *Arkansas Democrat–Gazette* *("ADG")* (Docket No. 232) be, and it is hereby, DENIED.

---

8. The issue of the procedure to be used at trial was touched upon briefly during the hearing. After reflecting further on this issue, the Court finds that it will be necessary for Ms. Davis to refuse to answer these questions before the jury, assuming that is her final decision. Of course, the Court will address any contempt or sanction issues outside the presence of the jury.