UNITED STATES of America,

v.

Donald MARKIEWICZ a/k/a Donald Marks, Linda Markiewicz a/k/a Linda Marks, Linda Hill, Neil "Buck" Thomas, Irene Thomas, Otatdodah Homer, William Beglen, John Kane, Brenda Kane, Martin Dockstater, Edward "Teddy" Dockstater a/k/a "Teddy Bear", Jason "Jake" Dockstater, Larry Chrisjohn, Defendants.

No. 89–CR–88.

United States District Court,
N.D. New York.

March 9, 1990.

---

Frederick J. Scullin, Jr., U.S. Atty. (John J. Brunetti, Asst. U.S. Atty., N.D.N.Y., of counsel), Syracuse, N.Y., for U.S.

G. Robert McAllister, Syracuse, N.Y., for defendant Donald Markiewicz.

Mark D. Romano, Syracuse, N.Y., for defendant John Kane.

William K. Hatch, Syracuse, N.Y., for defendant Irene Thomas.

Capriles & Bankey (Robert Capriles, of counsel), Syracuse, N.Y., for defendant Brenda Kane.

Stephen Lance Cimino, Syracuse, N.Y., for defendant William Beglen.

James H. Medcraf, Syracuse, N.Y., for defendant Otatdodah Homer.

Kate Rosenthal, Syracuse, N.Y., for defendant Linda Markiewicz.

Robert G. Wells, Syracuse, N.Y., for defendant Linda Hill.

Thomas F. Shannon, Syracuse, N.Y., for defendant Neil Thomas.

Bond, Schoeneck & King (S. Paul Battaglia, of counsel), Syracuse, N.Y., for movants Dale Seth, Lori Duffy and Jeff Bachman.

McKenzie, Smith, Lewis, Michell & Hughes (Nancy L. Pontius, of counsel), Syracuse, N.Y., for proposed intervenors Scott Atkinson, Carol Clark and David Bullard.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

Before the court is a motion to quash subpoenas served by the United States government on three newspaper reporters. The three reporters are Dale Seth, Lori Duffy and Jeffrey Bachman. Seth is employed by the *Oneida Daily Dispatch;* Duffy works for the *Syracuse Post–Standard;* and Bachman is a former reporter for the *Post–Standard.* The motion which they bring raises the complex issue of the extent of a reporter's qualified first amendment privilege.

### BACKGROUND

The underlying case is criminal. It stems from an indictment which alleges criminal acts occurred on the Oneida Indian Territory (the "Territory") located in the City of Oneida, New York. The criminal allegations in the indictment include embezzlement and stealing, rioting, arson, assault, contempt and perjury. The centerpiece of the acts alleged is the burning down of a bingo hall on the Territory, which occurred on February 21, 1988.

The government has served subpoenas *ad testificandum* upon three newspaper reporters who reported on the Oneida Indian conflict as it unfolded. The reporters are subpoenaed because they reported statements made by several defendants in this case over a period of time from February 1, 1988 through March 12, 1989. The government, through Assistant U.S. Attorney John Brunetti, has stated that it merely seeks to have the reporters testify that the defendants made the statements reported in the newspapers.[1] The reporters seek to quash the subpoenas, asserting a qualified first amendment privilege.[2]

---

1. An example of one of these statements is that attributed to defendant William Beglen. "In no way are we going to allow anyone to come in here and take our people out by force. That is an act of aggression by another nation. We will take whatever steps seem appropriate." *The Syracuse Post–Standard,* February 2, 1988, at page B–4. Count III, ¶ 18, of indictment 89–CR–88 quotes this statement as an overt act in furtherance of a conspiracy to violate 18 U.S.C. § 2101, entitled "Riots."

2. The government has also subpoenaed two television reporters from WTVH Channel Five, with the expectation of subpoenaing one more reporter from Channel Five. These three, Carol Clark, David Bullard and Scott Atkinson, were represented at oral argument by counsel. Counsel for the government and counsel for the three television reporters have agreed to attempt to arrive at an understanding with respect to the testimony of these three television reporters. Accordingly, the court at this time will not ad-

Movants have acknowledged that the testimony which the government seeks is relevant. Reply Memorandum, Docket ("Doc.") No. 109, at 5. Even so, they have not expressly stated the respect in which they view the sought after testimony to be probative. The published statements which the government seeks to confirm are included in the indictment as overt acts in Count III. Count III charges 10 defendants with conspiring to travel in interstate commerce or to use a facility of interstate commerce with the intent to incite riot and commit an act of violence in furtherance of a riot in violation of 18 U.S.C. § 2101. Consequently, some of the focus of the submissions filed on the motion to quash has been on an interpretation of § 2101.

The instant motion was argued on the morning of March 1, 1990. In the interest of removing potential roadblocks on the eve of trial, the court issued a decision from the bench that afternoon. This Memorandum–Decision and Order is substantially similar to the bench decision delivered on March 1, 1990.

## DISCUSSION

An appropriate place to commence discussion of the reporters' motion is with reference to the Supreme Court's seminal decision on the issue of reporters' testimonial privilege, *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1971). In *Branzburg* the Court determined that reporters could be forced to testify before criminal grand juries. Many lower court cases dealing with the issue of a reporter's privilege not to testify in civil and criminal cases of course have cited the *Branzburg* case. However, the variety of interpretations of *Branzburg* is astonishing. Thus, some courts state that *Branzburg* stands for the proposition that reporters enjoy no *absolute* immunity before a criminal grand jury. *See, e.g., von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 142 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *Continental Cablevision, Inc. v. Storer Broadcasting Co.*, 583 F.Supp. 427, 432

dress the propriety of the subpoenas issued or to

(E.D.Mo.1984). At least one other court has paraphrased the holding of the *Branzburg* case in an affirmative manner which contrasts with the characterization in *von Bulow* and *Continental Cablevision*, but does not contradict that characterization. That court stated that *Branzburg* stands for the proposition that reporters *do* enjoy a *qualified* immunity before a criminal grand jury. *See Pinkard v. Johnson*, 118 F.R.D. 517, 520 (M.D.Ala.1987). Yet a third breed conceives of *Branzburg* as indicating that reporters are not entitled to even a *qualified* immunity before a criminal grand jury. *See, e.g., O'Neill v. Oakgrove Const., Inc.*, 71 N.Y.2d 521, 528, 528 N.Y.S.2d 1, 4, 523 N.E.2d 277, 280 (1988); *Reporters Comm. for Freedom of the Press v. American Telephone & Telegraph Co.*, 593 F.2d 1030, 1062 n. 107 (D.C.Cir. 1978), *cert. denied*, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979).

The confusion seems natural in light of the fact that *Branzburg* is a five/four decision in which the fifth vote was cast by Justice Powell who not only joined in the majority's opinion but wrote a separate concurrence. On the one hand, the tack taken by the majority opinion is not receptive to a reporter's asserted privilege. *See, e.g.*, 408 U.S. at 698, 92 S.Ct. at 2665 ("We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us."); *Id.* at 703–04, 92 S.Ct. at 2668 ("The administration of a constitutional newsman's privilege would present practical and conceptual difficulties of a high order."). On the other hand, the concurrence advocates a balancing test in determining whether a reporter should be accorded a privilege. Consequently, in at least one respect, Justice Powell agrees with the four dissenters, prompting a leading commentator to observe: "Despite the holding in *Branzburg* and the discouraging tone of the majority opinion, the lower federal courts have consistently read the case to support some kind of qualified privilege for reporters" because five Justices appar-

be issued to the Channel Five reporters.

ently believed "that the Constitution may at times protect the confidentiality of a journalist's sources." L. Tribe, *American Constitutional Law*, § 12–22, at 972 (2d ed. 1988).

This court, located as it is in the Second Circuit, is bound to follow the authority of that Court of Appeals. Thus, in an effort to clarify the confusion left in the wake of *Branzburg* the court has turned to Second Circuit precedent. The Circuit has supplied express statements which are helpful, yet not in an ultimate sense. First, and importantly, the Second Circuit has held that a reporter may invoke his or her qualified privilege in either a civil or criminal setting. *United States v. Burke*, 700 F.2d 70, 77 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). Further, the court, per Judge Kaufman, indicated in an earlier decision that a reporter's invocation of a privilege is not as likely to be successful in a criminal setting as it is in a civil setting. *Baker v. F & F Investment*, 470 F.2d 778, 784 (2d Cir.1972), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973) (distinguishing *Branzburg* by stating "[n]o such criminal overtones color the facts of this civil case").

Questions, however, remain. In *Burke* the court reviewed the appeal of a criminal case in which the district court had refused to permit a criminal defendant to subpoena the work product, notes, etc., of a *Sports Illustrated* reporter. The *Burke* court upheld the lower court's decision in that regard because the information would have been used to impeach the credibility of a witness whose credibility already had been significantly impeached by other means at trial. In other words, the documents sought were cumulative. Curiously, and without explanation from Judge Meskill who wrote for the court in *Burke*, the lower court permitted the defendant to subpoena the reporter himself, and that reporter testified over his counsel's objection. Although the decision to permit the subpoenaing of the reporter was not appealed, the *Burke* decision leaves the specter that a reporter's privilege is more likely to be honored with respect to a subpoena *duces*

*tecum* rather than a subpoena *ad testificandum*.

 This court holds that a qualified first amendment privilege applies to the present situation. The extent of the privilege is governed by the circumstances. *Branzburg*, 408 U.S. at 710, 92 S.Ct. at 2671 (Powell, J., concurring); *see* discussion *infra*. Thus, on one end of a continuum, several courts have held that "[a] reporter's observations of a public place or event are no different than that of other individuals; and as to this, they are not entitled to constitutional protection." *See, e.g.*, *Alexander v. Chicago Park Dist.*, 548 F.Supp. 277 (N.D.Ill.1982). Absent observations of public events, several factors diminish the weight to be accorded the qualified privilege claimed by a newspaper reporter. As already noted, the Second Circuit has held that the privilege is diminished when the trial before which the reporter is to testify is criminal. *Baker*, 470 F.2d at 784; *Driscoll v. Morris*, 111 F.R.D. 459, 461 n. 6 (D.Conn.1986). Second, the privilege is diminished when the subpoenaing party does not seek testimony of a confidential nature. *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597 (1st Cir.1980); *see also In re Petroleum Products Antitrust Litigation*, 680 F.2d 5 (2d Cir.1982) (per curiam), *cert. denied*, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982). Third, as hinted previously, the privilege does not carry as much weight when the reporter himself is subpoenaed, as opposed to when a party seeks to compel the reporter to produce unpublished documents. *Maughan v. NL Industries*, 524 F.Supp. 93, 95 (D.D.C.1981). Fourth, if the questions put to a reporter are narrowly limited, then subpoenaing a reporter is more acceptable. *N.L.R.B. v. Mortensen*, 701 F.Supp. 244, 250 (D.D.C. 1988). Concomitantly, certain questions will not interfere with a reporter's first amendment rights as much as other questions. *Continental Cablevision*, 583 F.Supp. at 435. One court has provided examples of questions which will not set off many first amendment alarms and bells. These are "whether [an article] was truly published on the date asserted and

whether [the reporter] did in fact interview [the defendants] ... before writing the article." *Maughan*, 524 F.Supp. at 95. In addition, at least one court has determined that a reporter's qualified privilege is waived if he or she submits to an interview or files an affidavit detailing the substance of the conversation with respect to which he is asked to testify. *Pinkard*, 118 F.R.D. at 523.

Finally, in examples not relevant to the instant case, courts have held that a reporter waives his or her privilege when that reporter sues another. *Driscoll v. Morris*, 111 F.R.D. 459 (D.Conn.1986). In addition, a reporter's privilege is not given as much weight in a libel case against that reporter as in other civil cases. *See, e.g., Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *Garland v. Torre*, 259 F.2d 545 (2d Cir.), *cert. denied*, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958). A similar recitation of factors which diminish the strength of a reporter's qualified privilege has prompted one district court to observe that "there are some types of ... testimony as to which the qualified reporter's privilege is practically insignificant." *Continental Cablevision*, 583 F.Supp. at 435.

■ Perhaps most frustrating in a review of the case law dealing with the qualified privilege is the fact that, although many courts recognize that the factors just recited impact on the balancing which a court must undertake to evaluate the propriety of invoking the privilege in a particular instance, not one court has identified how each factor impacts on the standard to be applied when a reporter seeks to invoke his or her privilege. The frequently recited standard in instances of reporter privilege is one well entrenched in the Second Circuit. Specifically, the court in this circuit has held that in order to overcome the privilege a party must demonstrate that "the information sought is highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." *United States v. Burke*, 700 F.2d at 77; *In re Petroleum Antitrust Litigation*, 680 F.2d

at 7–8; *see also Garland*, 259 F.2d at 550 (Constitution does not protect a reporter for refusing to testify in a deposition when the question asked goes "to the heart of the plaintiff's claim"). Another standard stated by a different circuit is that a party wishing to overcome the privilege must establish that the information is relevant, that it cannot be obtained by alternate means, and that there is a compelling interest in gaining the information. *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981).

In the *Petroleum Products Antitrust* case, the Second Circuit instructed that since Justice Powell cast the deciding vote in *Branzburg*, his reservations are particularly important in understanding the decision. 680 F.2d at 8 n. 9. Therefore, in discerning the proper standard to apply in the instant case the court returns to Justice Powell's concurrence in *Branzburg*. He outlined the balancing test as follows: "[t]he asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." 408 U.S. at 710, 92 S.Ct. at 2671. Accordingly, it is this court's opinion that the test to be employed should be flexible and not gauged by the relatively unforgiving test of whether the material sought is highly material, critical, and not available from alternate sources. *Solargen Elec. Motor Car Corp. v. American Motors Corp.*, 506 F.Supp. 546, 552 (N.D.N.Y.1981) (Munson, J.).

In order to discern the appropriate test for the situation at bar, the court will review some of the factors previously outlined. First, this is a criminal case. Second, the testimony sought by the government does not involve confidential sources or materials. Third, the government only seeks reporters' testimony and not their notes. Fourth, the government has proposed limited questioning. Finally, the questions asked will be similar in nature to the ones outlined in *Maughan* as questions for which there was little interference with first amendment rights. These are all

factors which militate against permitting invocation of the privilege.

In addition, prior to setting a standard, it seems appropriate to review the interests of the reporters, and the public, which are potentially impinged by the testimony which the government seeks. Compelling the reporters to testify in court will arguably obstruct, in some fashion, the free flow of information to the public because the reporters will be in court testifying and not gathering information or writing articles. Although the testimony sought may be short in nature, this court is only too well aware of the fact that gauging when a witness will be called is not, and cannot be, an exact science. Even though this court often attempts to accommodate witnesses with scheduling difficulties, any reporter may have to wait a while, perhaps most of a day, in anticipation of testifying. In the end, the interest of being free to conduct the business of a reporter weighs in favor of permitting the movants to asset their first amendment privileges.

Movants have also asserted that if they are compelled to testify they will be shunned in the future by other sources with information. This court cannot abide by this characterization of the result of refusing to quash the subpoenas. *See Branzburg,* 408 U.S. at 693–98, 92 S.Ct. at 2662–65. Whether the first amendment recognizes irrational proclivities is debatable. Certainly, however, the issue of shunning can be carried too far afield. As the government points out, the reporters are only going to be asked to testify on matters they have already written on. Thus, compelling testimony will not impinge on any pacts of confidentiality. Furthermore, the reporters cannot logically be seen as agents of the government because they are being subpoenaed; they are being *compelled* to testify and are not testifying of their own volition. Parenthetically, the court notes that movants are in a particularly advantageous position to convey the message of how they were *compelled* to testify.

Movants also assert that their employers will be subsidizing the testimony because they will be testifying on their employers' time. This is true for any day-time employee who is served with a subpoena *ad testificandum.* This factor does not weigh in favor of any first amendment privilege.

As the above recital illustrates, the one factor impinged upon by the instant situation is that the reporters will be waiting to testify or testifying, as opposed to gathering and reporting the news. Accordingly, the court holds that the appropriate standard for reviewing the claimed privilege is whether the testimony sought is relevant, not unduly cumulative, and not available from other sources. The court believes that the articulated standard is the appropriate standard because it requires the government to attempt to obtain the information from other sources first. The reporters will only be called as a matter of last resort and accordingly will be freer to gather and publish the news. In addition, given the lack of confidential information sought by the government, the court is of the opinion that the requirement of a high level of materiality should be diminished to one of relevancy.

Before moving on, the court notes that the second and third factors may overlap and yet are distinct. Some testimony may not be available from other sources, for example only a subpoenaed reporter may be available to testify that a defendant made a certain statement. Yet, such testimony may be overly cumulative because the defendant's statement may only be relevant to one point which has been demonstrated by several other statements of different content which were already attributed to that defendant.

■ Applying the standard to the facts at bar, the court observes that relevancy has been conceded by the movants. There is a debate, however, regarding how the testimony is relevant and whether it is cumulative. Much of movants' papers relate to whether the newspapers are facilities of interstate commerce under 18 U.S.C. § 2101, the riot statute, and whether defendants "used" the newspapers. Without putting the matter to a hearing, the court believes that, if the government chooses, it

should be able to present the matter to the jury at trial. First, it is arguable that the defendants "used" the newspapers in the same way an advertiser "uses" a newspaper, namely, to get a message across. Second, despite the opinion in *United States v. O'Dell,* 671 F.2d 191 (6th Cir.1982) (holding that Kentucky newspapers, some of which were sent to Indiana, were not a facility of interstate commerce under the Travel Act, 18 U.S.C. § 1952), by which this court is not bound, this court for purposes of the motion at bar considers the newspapers at issue to be facilities of interstate commerce. Movants admit that they send out stories over the wires to the Associated Press and United Press International. This is interstate activity. *Cf. United States v. Riccardelli,* 794 F.2d 829 (2d Cir.1986) (any use of the mails, not just interstate mailings, invoke federal jurisdiction under the Travel Act).

While movants assert, and the government has previously acknowledged, that the government has phone records of interstate or international phone calls placed by defendants, it is not this court's intention to restrict the government's proof on the issue of the use of interstate facilities. Given the high burden of proof which the government must meet at a criminal trial, proof of phone conversations plus proof of the use of newspapers as facilities of interstate commerce is not unduly cumulative. Moreover, in conceding the relevance of the sought after testimony and arguing that the sought after testimony is not probative of the use of interstate facilities, the movants are conceding that the testimony is relevant in some other respect, albeit not specifically described. The parties have not addressed cumulativeness with respect to this second area of relevancy. Even so, the court notes that the fact that the sought after testimony is relevant in an additional respect can reduce the likelihood that the presentation of the reporters' testimony will be unduly cumulative.

Finally, the court addresses the issue of whether the information sought from movants is obtainable elsewhere. The government states in its memorandum of law that "[a]ttempts have been made to contact peo-ple who may have heard any of the statements referred to in the overt acts. These attempts have been negative mainly because these statements were made in front of the co-conspirators of the speaking parties who either are fugitives, unidentified or co-defendants." Response Memorandum, Doc. No. 101, at 7. Furthermore, in his affidavit, Assistant U.S. Attorney John J. Brunetti states that he interviewed at least 60 persons in preparing the present case and that of these sixty he has not encountered a single individual who overheard the interviews. Brunetti Affidavit, ¶ 2. While the information provided by the government could be more specific, the court holds that the information provided demonstrates that the government cannot obtain the sought after testimony from other sources. Accordingly, the court holds that the government has demonstrated that the testimony sought from movants is relevant, not unduly cumulative, and not available from alternate sources.

For the foregoing reasons, the newspaper reporters' motion to quash the subpoenas is denied. However, it is denied without prejudice. The newspaper reporters may raise the issue anew if they in good faith believe, after testimony has been given in the case, that their testimony will be unduly cumulative.

It is So Ordered.