David LIPINSKI, Plaintiff,

v.

John M. SKINNER, Frederick J. Cabbell, Jr., Richard J. Kadien, James F. Carter, and John Does 1–10, individually and in their official capacities, Dr. S. Keith Kennedy, individually and in his official capacity, Police Superintendent Thomas Constantine, individually and in his official capacity, the New York State Police, John Campbell, Gerald Brundage, Robert Martone, and John Does 11–20, individually and in their official capacities, Sheriff Anthony C. Ruffo, individually and in his official capacity, the Broome County Jail, and Broome County, Defendants.

No. 88–CV–601.

United States District Court, N.D. New York.

Dec. 9, 1991.

See also 700 F.Supp. 637.

**132**

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City (Paul D. Young, of counsel), for plaintiff.

Pearis, Resseguie, Kline Barber & Lebous, Binghamton, N.Y. (Stuart M. Pearis, of counsel), for Binghamton Press.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Before the court is a motion by the Binghamton Press Company Division of Gannett Satellite Information Network, Inc. ("Binghamton Press") to quash the depositions noticed by plaintiff on December 5, 1990, and to obtain a protective order to prevent any intrusion upon Binghamton Press or its present and former employees with regard to the issues in this lawsuit. Plaintiff's intent to depose derives from the allegedly critical information held by Binghamton Press and/or its present and former employees. The motion by Binghamton Press to quash the depositions and obtain a protective order hinges on Fed. R.Civ.P. 26(c), which permits the court to prohibit, limit, or prescribe discovery. For the reasons set forth below, the motion by Binghamton Press is granted in part and denied in part.

## I. FACTS

This action involves alleged violations of plaintiff's civil and constitutional rights. On June 2, 1987, two New York State Police Investigators took plaintiff into custody for questioning regarding plaintiff's conduct at a "beer and pot" party. After placing plaintiff in a closed interrogation room, two officers accused plaintiff of sodomizing a teen-age boy and interrogated him for over two hours. Plaintiff denied any involvement. The officers then announced to plaintiff that he was under arrest. Plaintiff bolted from the room, but several officers and investigators outside the interrogation room stopped and subdued him. During the melee, Investigator Skinner punched plaintiff, opening a gash over plaintiff's left eye. The blow also broke the skin on Skinner's knuckles. Senior Investigator Kadien, concerned about potential health risks to Skinner, ordered that a Human Immunodeficiency Virus ("HIV") test be conducted on plaintiff.

Investigator Kadien asked plaintiff for permission to draw a blood sample to test for "communicable diseases" but plaintiff refused. Then Officer Carter, one of the police officers who had been inside the interrogation room, requested plaintiff to sign a consent form for a blood test, telling him that it was standard procedure to test inmates for "VD and syphilis." Again plaintiff refused, after which Officer Carter allegedly threatened: "If you don't give us permission for this blood test, a court order will be gotten and you will be held down and blood will be taken forcibly from you." Plaintiff's Amended Complaint, Document ("Doc.") 7, ¶ 57. Plaintiff then acquiesced and signed the consent form authorizing blood to be drawn to test for "communicable diseases." Plaintiff asserts that he was not informed by Kadien or Carter that they wished to test his blood for the HIV antibodies, nor did the form state that consent included permission to perform an HIV-antibody test.

After obtaining plaintiff's signed consent form, Investigators Kadien and Cabbell, Officer Carter, and additional unknown officers escorted plaintiff to Binghamton General Hospital for HIV testing. Upon arrival they met with Dr. Petell, who declined to extract a blood sample from plaintiff because Dr. Petell believed hospital procedure mandated that officers obtain a court order or specific HIV testing consent form before an HIV antibody test could be conducted. The defendant officers then summoned Dr. Kennedy who, with the assistance of several nurses and Officer Carter, forcibly extracted a sample of plaintiff's blood for HIV testing. None of the officers or hospital staff present at the time informed plaintiff that his blood would be tested for HIV antibodies. Two days later, on June 4, 1987, Officer Carter told plaintiff's mother, who passed the information on to plaintiff, that his blood had been extracted to perform an HIV-antibody test.

On June 22, 1987, Dr. Kennedy received the test results revealing that plaintiff tested positive for the HIV antibodies, and the doctor relayed this information directly to Investigator Skinner. Plaintiff's Amended Complaint alleges on information and belief that New York State Police then disclosed the test results to Broome County Jail authorities. Doc. 7, ¶ 74. After receiving the test results, jail authorities took plaintiff out of the general prison population and moved him to an isolation cell in the Broome County Jail. Plaintiff did not learn of the test results until later that day when a nurse at the jail informed plaintiff that he had been exposed to the HIV virus.

On June 25, 1987, Binghamton Press printed the first of several articles which stated plaintiff's name, the charges against him, and that he was a carrier of AIDS. The author of the first article, Bridgette A. Lacy, wrote that "Broome County Jail officials are dealing with the facility's first known case of an inmate testing positive for the AIDS virus, Broome County Sheriff Anthony C. Ruffo said last night. Results from tests on inmate David R. Lipinski, 27, showed that he is a carrier of the deadly disease, Ruffo said." Exhibit ("Exh.") B attached to Doc. 36, at 1. Various staff and editorial writers authored additional articles regarding plaintiff's status as a carrier of the AIDS virus several weeks and months later. Lou Ziegler (former managing editor) provided a news story about plaintiff on July 5, 1987. Jeff Davis (editorial writer) published news articles concerning plaintiff on August 4, 5, 9, and 11, 1987. Keith George (staff writer) authored an article about plaintiff on September 18, 1987. George Basler (staff writer) published his story on plaintiff on February 12, 1988. See Exh. B attached to Doc. 36.

Plaintiff alleges that Broome County Jail authorities were the source of Binghamton Press' initial information, and that the jail authorities breached New York State Department of Health Policy confidentiality requirements for HIV testing by informing Binghamton Press of plaintiff's HIV status. Doc. 7, ¶¶ 3, 79, 82–83. Among other actions of the defendants, by forcibly testing plaintiff for HIV antibodies without his consent and failing to protect the confidentiality of his test results, plaintiff claims each of the defendants negligently and recklessly disregarded his civil and constitutional rights. Plaintiff served a general deposition subpoena on Binghamton Press on December 5, 1990, seeking to depose several current and former employees of Binghamton Press who have knowledge of the facts and circumstances concerning the plaintiff, the plaintiff's arrest, and the plaintiff's HIV test and published results. Specifically, plaintiff seeks to depose present and former Binghamton Press employees Lou Ziegler, Jeff Davis, Keith George, George Basler, and any other person(s) with similar knowledge. In addition, plaintiff's deposition subpoena commands that these individuals bring with them to the deposition any information they have regarding plaintiff.

These individuals were served with individual deposition subpoenas on various dates between December 6, 1990 and January 2, 1991. On December 12, 1990, Binghamton Press filed an order to show cause seeking a temporary restraining order, and also seeking an order quashing the deposition subpoenas and preventing plaintiff

from deposing any of these current and past employees of the newspaper. On December 21, plaintiff consented to a temporary restraining order regarding the deposition subpoenas. In exchange for the temporary restraining order, Binghamton Press revealed the location of former employee Bridgette Lacy, who is now a resident of Indianapolis, Indiana. Under subpoena, on January 4, 1991, plaintiff's counsel deposed Ms. Lacy. At her deposition, Lacy testified that she telephoned Sheriff Ruffo and informed him she had received reports that a man with AIDS was in the Broome County Jail. Deposition of Bridgette Lacy, Doc. 47, at 23–25, 36–37. She further testified that during their telephone conversation Sheriff Ruffo confirmed this information[1] and, in response to her inquiry regarding which inmate tested positive for AIDS, stated and spelled plaintiff's last name, "Lipinski." *Id.* at 24.

To date, none of the other Binghamton Press employees have been deposed. After several extensions of the temporary restraining order by consent of the parties while attempting to resolve the discovery dispute, the court heard oral argument on the motion to quash the outstanding deposition subpoenas and obtain a protective order on April 29, 1991. Binghamton Press indicated that it refuses to permit the taking of any further depositions by plaintiff. The newspaper requests this court to exercise its authority under the Fed.R.Civ.P. 26(c) to protect its current and former employees from depositions which might reveal confidential, irrelevant, or privileged material, and to shield them from being required to testify regarding the gathering of information, reporting, editing, and publishing of news stories.

Plaintiff opposes the motion on the ground that the desired information is essential to his claim and that First Amendment protections do not sweep so broadly as to shield Binghamton Press from complying with the requested deposition subpoenas.

## II. DISCUSSION

The question Binghamton Press presents is whether its current or former employees, who are not parties to the pending lawsuit, must submit to plaintiff's deposition subpoenas requesting information regarding the disclosure of plaintiff's Human Immunodeficiency Virus test results. Binghamton Press urges the court to exercise its discretion under Rule 26(c) to quash the deposition subpoenas and issue a protective order. Rule 26(c) provides, in pertinent part:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expenses.... If the protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery.

Binghamton Press asserts that editorial writer Jeff Davis is absolutely immune from being required to reveal confidential information or confidential sources of information under N.Y. Civil Rights Law § 79–h(b) (McKinney's Supp.1991) ("New York's Shield Law"). Additionally, Binghamton Press seeks qualified immunity under N.Y. Civil Rights Law § 79–h(c) and federal case law for each of the individuals plaintiff wishes to depose with regard to nonconfidential news and nonconfidential sources.

As a threshold matter the court notes that, under Fed.R.Evid. 501, state privileges are relevant but do not control

---

1. The record does not indicate that plaintiff actually contracted the AIDS virus, but only that he tested positive for HIV antibodies. Although the article written by Bridgette Lacy states that "an inmate test[ed] positive for the AIDS virus," the article goes on to state that Lipinski's test results "showed that he is a carrier of the deadly disease," which the court acknowledges is not analogous with actually contracting AIDS. Lacy testified at various points during her deposition that Sheriff Ruffo confirmed that plaintiff had AIDS, but also testified that Sheriff Ruffo told her an inmate had been tested and was a carrier of AIDS. For purposes of the motion at bar, the court shall refer to the test as one for HIV antibodies.

the final decision of whether or not to issue a protective order. *See Solargen Elec. Motor Car Corp. v. American Motors Corp.,* 506 F.Supp. 546, 551 (N.D.N.Y.1981) (Munson, J.). Because plaintiff grounds numerous claims in state law and Binghamton Press asserts several state law arguments in support of the instant motion, the court will examine relevant privileges recognized under New York State law. *See, e.g., von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 144 (2d Cir.1987), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987) (reasoning that "[i]n examining the boundaries of the journalist's privilege, we may consider also the applicable state law, in this case New York's so-called 'Shield Law,' N.Y. Civ. Rights Law § 79–h *et seq.*"); *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 89 F.R.D. 489, 492 (C.D.Cal.1981) (noting that "under Rule 501, when a civil action in federal court contains a combination of federal and state claims or defenses, federal courts should evaluate claims of privilege under both state and federal law"). The federal law of privilege, however, governs the ultimate question whether to recognize the privileges asserted by Binghamton Press. *von Bulow by Auersperg v. von Bulow,* 811 F.2d at 141.

### A. Absolute Immunity

This court embraces the liberal discovery provisions available against nonparties and adheres to the sweeping language contained in Fed.R.Civ.P. 26(b) and in *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947) (holding that "the deposition-discovery rules are to be accorded a broad and liberal treatment"). Fed.R.Civ.P. 26(b)(1) provides in relevant part that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action...." Nevertheless, this court acknowledges that such generous discovery provisions do not apply with equal force when the guarantees of free press are implicated. Section 79–h(b) of the New York Civil Rights Law grants absolute protection from contempt to professional journalists who refuse to reveal confidential information or confidential sources of information. That section provides, in pertinent part:

> (b) Exemption of professional journalists and newscasters from contempt: Absolute protection for confidential news.... No professional journalist or newscaster presently or having previously been employed or otherwise associated with any newspaper, ... shall be adjudged in contempt by any court in connection with any civil or criminal proceeding, ... for refusing or failing to disclose any news obtained or received in confidence or the identity of the source of any such news coming into such person's possession in the course of gathering or obtaining news for publication or to be published in a newspaper....

 Federal courts agree that an unqualified protection exists which shelters journalists from disclosing confidential sources, but they do not invoke it unless, after balancing competing interests, the scale tips in favor of nondisclosure. That is, on a case by case basis, federal courts generally weigh a reporter's claim to First Amendment protection from forced disclosure against the opposing party's claim to probative evidence. *United States v. Burke,* 700 F.2d 70, 77 (2d Cir.), *cert. denied,* 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *see also United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) (courts must balance defendant's need for desired information against journalist's interest in preventing production in a specific case); *cf. United States v. Hubbard,* 493 F.Supp. 202, 205 (D.D.C.1979) (deciding that an asserted claim to privilege should be judged by balancing freedom of the press against "the obligation of all citizens to give relevant testimony with respect to criminal conduct") (citing *Branzburg v. Hayes,* 408 U.S. 665, 710, 92 S.Ct. 2646, 2671, 33 L.Ed.2d 626 (1971) (Powell, J., concurring)). At least one eminent scholar also embraces the notion that journalists should not always be required to yield to disclosure requests, pointing out that "the Constitu-

tion may at times protect the confidentiality of a journalist's sources." L. Tribe, *American Constitutional Law*, § 12–22, at 972 (2d ed.1988).

■ Binghamton Press asserts on behalf of Jeff Davis, an editorial writer on its staff, that he is entitled to absolute protection under New York's Shield Law because enforcement of the Subpoena and Amended Deposition Subpoena "would require him to disclose news obtained or received in confidence." Binghamton Press' Memorandum of Law, Doc. 43, at 8. The burden of proving confidentiality rests with the journalist. *Solargen Elec. Motor Car Corp. v. American Motors Corp*, 506 F.Supp. 546, 551 (N.D.N.Y.1981) (Munson, J.); *Hennigan v. Buffalo Courier Exp. Co., Inc.*, 85 A.D.2d 924, 446 N.Y.S.2d 767 (4th Dep't 1981) (party asserting immunity has burden of proof). Davis makes two general statements that he possesses confidential information, but these assertions do not supply convincing evidence that confidential information will be disclosed. *See* Affidavit of Jeff Davis, Doc. 44, ¶¶ 12–13. Moreover, Davis offers nothing to indicate that every piece of information he possesses relevant to this lawsuit is confidential. His claim to an absolute privilege would be much more compelling if he asserted the privilege in response to particular questions directed to him at a deposition, or if his answer to a question delineated specifically which diary or letter or notes contained the confidential information he seeks to protect from disclosure. *Cf. Solargen*, 506 F.Supp. at 552 (holding that reporters must respond to subpoenas *ad testificandum* and "assert whatever privilege they may properly invoke in response to particular questions"). Because Davis fails to demonstrate convincingly that the confidentiality of his sources or information are jeopardized by the mere taking of his deposition, he is not entitled to absolute immunity. Therefore, to the extent that Binghamton Press' motion to quash is based on a claim of absolute immunity for Jeff Davis, the motion is denied.

### B. Qualified Immunity

■ Section 79–h(c) of the New York Civil Rights Law provides professional journalists with qualified protection from contempt for refusing to disclose nonconfidential news. News and news sources are protected unless the movant makes a clear and specific showing that the information is: (i) highly material and relevant; (ii) critical or necessary to the maintenance of a party's claim, defense, or proof of a material issue; and (iii) not obtainable from an alternate source. N.Y. Civil Rights Law § 79–h(c). The Second Circuit laid the groundwork for the test now codified at section 79–h(c) in *United States v. Burke*, 700 F.2d 70, 77 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). However, as this court noted in *United States v. Markiewicz*, 732 F.Supp. 316, 320 (N.D.N.Y.1990) (Munson, J.), courts should not apply the three-pronged standard as if strapped by a set of wooden rules. Rather, the test should be flexibly employed, taking into account various factors which diminish the strength of the qualified immunity privilege. *Markiewicz*, 732 F.Supp. at 320. For example, "if the questions put to a reporter are narrowly limited, then subpoenaing a reporter is more acceptable." *Id.* at 319, *citing N.L.R.B. v. Mortensen*, 701 F.Supp. 244, 250 (D.D.C.1988).

Nevertheless, the *Burke* standard does pose a substantial hurdle which the party seeking discovery must overcome. The nature of the qualified privilege derives from cherished principles of free press and free speech embodied in the First Amendment. The Second Circuit's view of the First Amendment fosters these well-established objectives and guides this court in weighing the competing interests at bar:

> This demanding burden [the three-tiered test] has been imposed by courts to reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment.

*Burke*, 700 F.2d at 77.

Against this formidable background plaintiff, urging liberal discovery, seeks to

depose various Binghamton Press present and former employees to determine how the results of his HIV test were in fact released to the Binghamton Press for publication. Plaintiff asserts that he fulfills the standard enunciated in *Burke* and New York Civil Rights Law § 79–h(c). Plaintiff contends that his discovery requests encompass highly material and relevant information, that he will not inquire into confidential sources of information or confidential news, and that he will seek only information relevant to his claims for relief.

As to the second prong of the *Burke* test, that the desired information is critical to maintenance of his claim, plaintiff urges that the testimony of Ms. Lacy supplements but does not solidify his case. Because Lacy testified that she received her initial lead about an inmate in the Broome County Jail testing positive for the HIV antibodies from one of her editors, the question mark remains as to where Binghamton Press first acquired the information about this particular inmate. Plaintiff wishes to depose the editor(s) working with Ms. Lacy, Dave Edick and/or Steve Spero, to identify who disclosed plaintiff's HIV test information to one or both of them. Plaintiff also desires to depose Davis, Ziegler, George, and Basler to acquire any information they have regarding the disclosure of plaintiff's HIV test results. Plaintiff concedes that Lacy's testimony bolsters his claim that Sheriff Ruffo disclosed the HIV test results to Binghamton Press but, noting that she lives outside the Northern District of New York and is unwilling to testify at trial, plaintiff argues that live testimony of an editor is necessary, and may prove superior to the written deposition of Ms. Lacy.

As to the third requirement, plaintiff emphasizes that he has exhausted alternative sources of information. In support of this contention, plaintiff states that he previously conducted extensive discovery of all other relevant sources, including New York State Police and Broome County authorities, all of whom deny liability for releasing plaintiff's HIV test results.

The Southern District recently addressed an issue parallel to the issue at bar in *Sommer v. PMEC Associates*, 18 Med. L.Rptr. 2141, 1991 WL 73858 (S.D.N.Y. 1991). In that civil action Newsday, Inc., a nonparty, asked the court to quash subpoenas served on Newsday by defendant, PMEC Associates. Newsday had published articles concerning the dispute between plaintiff and defendants, and defendants' deposition subpoena served on Newsday demanded the presence of "a person familiar with the investigation of a news story about the conversion of North Shore Tower." *Id.* 18 Med.L.Rptr. at 2142. (citation omitted). Defendants also requested from Newsday six categories of documents, including "[a]ll documents concerning any investigation, examination, inquiry, research or study contemplated, performed or conducted by you in furtherance of a news story about the conversion...." *Id.* (citation omitted). Applying the three-pronged test set forth in *Burke* and in § 79–h(c) of the New York Civil Rights Law, the court quashed the deposition subpoena. *Id.* at 2143. Reasoning that the information sought by defendants applied to only one of plaintiff's sixteen claims and that defendants were provided with all of Newsday's published reports regarding the dispute, the court concluded that the desired information was not highly critical to defendants' claims. *Id.* Moreover, defendants failed to exhaust alternate sources because they did not, among other things, depose plaintiffs about their communications with Newsday. *Id.*

### 1. Staff and Editorial Writers

█ Several material facts from *Sommer* are virtually identical to those in the present case. In both cases nonparty newspapers use *Burke* and section 79–h(c) as a shield against broad deposition subpoenas demanding that the newspapers open their files and documents and make their employees available for questioning, despite the fact that the parties seeking discovery in both actions had in their possession all of the reports published by the newspaper from whom they were seeking discovery. Not surprisingly, then, a result similar to *Sommer* follows here as to Bing-

hamton Press employees Jeff Davis, Lou Ziegler, Keith George, and George Basler.

Davis' connection with this case is limited; although he published several articles about plaintiff, the articles were published more than forty days after Bridgette Lacy's story first appeared in the *Binghamton Press & Sun Bulletin*. Ziegler published only one news story about the plaintiff and that story appeared several weeks after Lacy's article. George's sole news story surfaced nearly three months after Lacy's article. Likewise, Basler published his story on Lipinski approximately seven months after the initial article.

Plaintiff's claim does not hinge on whether or not he deposes these four individuals. The critical evidence plaintiff seeks to discover is who disclosed plaintiff's HIV test results to the *Binghamton Press & Sun Bulletin*. Because the articles by Davis, Ziegler, George, and Basler were published so long after the initial article by Bridgette Lacy it is unlikely that they possess information regarding the initial disclosure, or that any information they do possess is merely repetitive of evidence already known to plaintiff. Thus, deposing these four individuals would not appear to further plaintiff's quest for information about the initial disclosure; indeed such depositions may serve collateral purposes unrelated to plaintiff's main objective. Their qualified immunity as news reporters should not be infringed by tertiary inquiries which, even if answered, do not supply a foundation for plaintiff's claims. *See, e.g., Burke*, 700 F.2d at 78 (upholding a *Sports Illustrated* reporter's First Amendment privilege where information sought from the news reporter's work papers would be merely cumulative). Moreover, the court will not permit litigation to jeopardize First Amendment values by disrupting information gathering or story writing by individuals such as these four reporters. *Cf. United States ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.*, 600 F.Supp. 667, 670–71 (S.D.N.Y.1985) (quashing a deposition subpoena because chilling effects on news broadcaster's willingness to interview trial witnesses or otherwise report or editorialize on court proceedings posed too great a risk to First Amendment values). Therefore, the motion by Binghamton Press to quash plaintiff's deposition subpoenas as to journalists Davis, Ziegler, George, and Basler is granted. Pursuant to this court's authority under Rule 26(c), these four individuals are hereby protected from any discovery requests filed by plaintiff in conjunction with this lawsuit.

### 2. Editors

■ Binghamton Press editors Dave Edick and Steve Spero are situated differently than the authors of the various articles and thus the value of their testimony to plaintiff's claim must be analyzed separately. Bridgette Lacy clearly states that she acquired her information about plaintiff through one of her editors, either Mr. Edick or Mr. Spero. Deposition of Bridgette Lacy, Doc. 47, at 17–18. Lacy contends that on the night of June 24, 1987, one of her editors, either Mr. Edick or Mr. Spero, informed her that "a Broome County inmate ... had AIDS and ... to contact the Sheriff to discuss it." *Id.* at 20. Hence, plaintiff seeks to depose these two individuals to determine where one or both of them acquired the information which ultimately resulted in the Lacy article naming plaintiff as the inmate.

The court finds that plaintiff's request to depose Edick and Spero satisfies the *Burke* standard. The information sought by plaintiff through these two depositions is highly material and relevant because, according to Ms. Lacy's deposition testimony, her first lead on the story came from either Edick or Spero. Discovering who gave Lacy the lead and where that individual acquired the information is critical to plaintiff's claim that one or more of the defendants released confidential medical information about plaintiff to the Binghamton Press and thereby violated his rights. Edick and/or Spero are a vital link in the chain of information which resulted in Lacy's article, and their depositions will likely assist plaintiff in his quest to substantiate the allegations in his amended complaint. The information plaintiff desires is not obtainable from other sources;

plaintiff has interviewed or deposed Sheriff Ruffo, Bridgette Lacy, and numerous Broome County Jail authorities and other individuals involved with this case and has been unable to determine how the HIV test results were initially released to Binghamton Press. Although Lacy's deposition provided additional information, she was unable to identify the individual who made the initial disclosure to the newspaper. No alternative sources exist to illuminate the origin of the leak of this confidential information. On these grounds, plaintiff satisfies all three prongs of the *Burke* test with respect to the two editors. Binghamton Press' motion to quash the deposition subpoena as it relates to editors Edick and Spero is therefore denied.

Nonetheless, plaintiff is not entitled to unlimited discovery of Edick or Spero. State and federal courts addressing the scope of discovery when First Amendment issues are involved have tailored discovery requests to fit the circumstances of each case. In *Dooley v. Boyle*, 140 Misc.2d 171, 531 N.Y.S.2d 158 (N.Y.Sup.Ct.1988), the court concluded, after applying New York's Shield Law and the *Burke* analysis, that notes of a media staff reporter relating to published articles were not discoverable en masse but were discoverable in limited form. That is, notes which directly attributed statements to various individuals were discoverable, but any nondiscoverable material, i.e., a nondiscoverable source listed on a discoverable note, would be redacted. *Id.* at 174, 531 N.Y.S.2d at 161; *see also In re Pennzoil Co.*, 108 A.D.2d 666, 485 N.Y.S.2d 533 (1st Dep't 1985). In *Pennzoil*, the court limited plaintiff's questions of a reporter to actual words used by defendant's chairman regarding defendant's approval of an agreement, declining to permit broad examination of the reporter concerning other aspects of his interview with defendant. *Id.* at 667, 485 N.Y.S.2d at 535.

In *Markiewicz*, 732 F.Supp. at 319–21, this court enumerated five factors to examine in determining whether and to what extent to permit discovery when First Amendment values are at stake. First, whether the case involves a civil or criminal matter. Second, whether the desired testimony pertains to confidential sources or materials. Third, whether the inquiring party seeks reporters' testimony and not their notes. Fourth, whether the questioning will be limited. And fifth, whether the questions cause interference with First Amendment rights. *Id.* at 320–21.

While *Markiewicz* involved an underlying criminal action, those five factors are applicable to this civil matter as well. Plaintiff's discovery request might involve confidential materials or confidential sources of materials, despite plaintiff's contention in opposition to the motion at bar that he will not inquire into anything of a confidential nature. On its face, the discovery plaintiff seeks from Edick and Spero is unlimited access to their notes and papers pertaining to the issues in this lawsuit as well as unlimited deposition questioning, again despite plaintiff's argument in opposition to the motion to quash that he will limit the scope of his quest. Finally, plaintiff's deposition subpoena impinges on First Amendment rights of free flow of information and a reporter's interest in pursuing stories and news gathering to some degree, because the journalists must testify at their depositions and may be required to testify in court as well rather than being free to pursue their daily professional activities.

The court concludes, after carefully weighing these factors and the holdings of the cases cited in this opinion, that plaintiff's discovery of Edick and Spero must be limited so as to minimize its impact on the journalists. Plaintiff is directed to limit his questions to information relative to the initial disclosure of plaintiff's HIV test results to Binghamton Press. The journalists are directed to bring with them to the depositions only those notes and papers pertaining to the initial lead one or both of them passed on to Bridgette Lacy that an inmate in the Broome County Jail had AIDS.[2]

---

**2.** The court notes that this was the information one or both of the editors provided to Lacy although, as previously recognized *supra* note 1, plaintiff's test results revealed only that he had

140

### III. CONCLUSION

In summary, the motion by Binghamton Press to quash plaintiff's deposition subpoenas and issue a protective order is granted as to journalists Davis, Ziegler, George, and Basler. As to editors Edick and Spero, the motion is denied but deposition questioning and access to records shall be limited to the narrow issue of the initial disclosure of plaintiff's HIV test results to Binghamton Press and the transfer of that information to then-staff writer Bridgette Lacy.

It is So Ordered.

been exposed to the AIDS virus, not that he had

contracted the disease.